UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| UNITED STATES OF AMERICA, | NO. CR20-195 RAJ |
|---|---|
| Plaintiff, | **INFORMATION** |
| v. | |
| DAVID M. GLUTH, | |
| Defendant. | |

The United States Attorney charges that:

### COUNT 1

### (Wire Fraud)

**A.   The Scheme To Defraud**

1.  Beginning at a time unknown, but no later than November 2011, and continuing until on or about June 29, 2016, at Mukilteo, within the Western District of Washington, and elsewhere, DAVID M. GLUTH and "J.H." devised and intended to devise a scheme and artifice to defraud various victims, including but not limited to, "W.F.," and financial institutions and lenders, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

2.  DAVID M. GLUTH and W.F. were partners in "Gluth Contract Flooring," or "GCF," a commercial flooring business based in Mukilteo, Washington. J.H. was the

Information/GLUTH - 1

bookkeeper for GCF. The essence of the scheme and artifice to defraud was for DAVID M. GLUTH and J.H. to improperly use GCF funds for their own personal benefit, to fraudulently obtain loans and credit for GCF without the knowledge or authorization of W.F., and to fraudulently alienate assets of GCF without the knowledge or authorization of W.F. DAVID M. GLUTH and J.H. engaged in numerous acts of deceit and concealment, including but not limited to: (a) making false and misleading statements and omissions to W.F. and others; (b) refusing to turn over business records that W.F. was entitled to review; (c) maintaining false and misleading business records; (d) making false and misleading statements and omissions in court filings and deposition testimony; and (e) using fraud, forgery, identity theft, and false statements to open bank accounts, obtain loans and credit, and alienate assets without the knowledge or authorization of W.F. Over the course of the scheme, the total amount of improper personal expenditures, assets that were improperly disposed of, and unauthorized indebtedness incurred by GCF, was approximately one million dollars or greater.

**B.     Manner and Means**

3.     DAVID M. GLUTH and W.F. formed GCF by an operating agreement (the "Agreement") on or about May 10, 2007. The Agreement provided that DAVID M. GLUTH and W.F. would be equal partners, and that DAVID M. GLUTH would run the day-to-day affairs of GCF. The Agreement provided that W.F. would personally guarantee up to $500,000 in credit that would provide capital for the business.

4.     The Agreement prohibited DAVID M. GLUTH from taking certain actions without W.F.'s written approval, including but not limited to, opening bank accounts for the company's use (other than accounts specified in the Agreement) and borrowing money (apart from specified borrowing authorized by the Agreement). The Agreement also prohibited DAVID M. GLUTH from engaging in significant business decisions, including disposing of property outside the ordinary course of business, without consulting with W.F. The Agreement also gave W.F. the right to inspect the books and records of the company.

5. In or about 2011, J.H. was hired as the bookkeeper for GCF.

6. It was part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. opened bank accounts in the name of GCF without W.F.'s knowledge or authorization. Per the Agreement, GCF maintained a bank account at Foundation Bank. The Agreement required W.F.'s authorization in order to open any additional bank accounts. DAVID M. GLUTH and J.H. opened bank accounts without W.F.'s knowledge or authorization, including but not limited to the following (collectively, the "secret accounts"):

   a. on or about September 11, 2012, at Wells Fargo Bank;
   b. on or about December 27, 2013, at Bank of America; and
   c. on or about February 7, 2014, at Whidbey Island Bank, also known as Heritage Bank.

7. It was further part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. used the secret accounts to further the scheme in a variety of ways. Among other things, DAVID M. GLUTH and J.H. diverted GCF funds to the secret accounts and used those funds to pay improper personal expenses. DAVID M. GLUTH and J.H. also used the secret accounts to receive funds from unauthorized loans, to make payments on unauthorized loans, and to transfer and conceal GCF funds. DAVID M. GLUTH and J.H. attempted to conceal the secret accounts from W.F. and others. By using the secret accounts for such activities, DAVID M. GLUTH and J.H. were able to conceal their scheme from W.F. and others, and to thwart any meaningful inspection of GCF's books and records. DAVID M. GLUTH and J.H. discussed the improper use and concealment of the secret accounts in instant messages. For example, on or about October 28, 2013, in an instant message, DAVID M. GLUTH asked J.H. if Foundation Bank might "discover" the existence of the Wells Fargo accounts. Similarly, on February 11, 2014, in an instant message, J.H. told DAVID M. GLUTH that activity related to an unauthorized loan would be concealed in "an already functioning wash account."

8. It was further part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. used GCF funds for unauthorized personal expenses. DAVID M. GLUTH and J.H. used GCF funds from a variety of sources, including but not limited to: GCF's American Express credit cards, GCF's Applied Bank credit card, GCF's Foundation Bank account, and GCF's Wells Fargo account. These unauthorized personal expenses included, but were not limited to: groceries, personal credit card bills, clothing, liquor, medical expenses, massages, travel expenses, personal taxes, and mortgage payments. The unauthorized personal expenses began no later than 2011, continued until October 2015 or later, and totaled several hundred thousand dollars.

9. It was further part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. concealed the unauthorized personal expenses from W.F. and others in a variety of ways, including but not limited to the following: using the secret bank accounts to pay for unauthorized personal expenses, and making false and misleading entries in the books and records of GCF. DAVID M. GLUTH and J.H. also concealed, and attempted to conceal, GCF's true financial condition from W.F. and others (including representatives of W.F.) who attempted to examine GCF's books and records to determine its condition.

10. It was further part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. discussed with each other how to conceal the unauthorized personal expenses from W.F. and others. For example, in an instant message on or about February 11, 2014 – after a discussion of how to conceal an unauthorized loan – DAVID M. GLUTH told J.H. that "the next worry is [W.F.] digging into my Hawaii trip and where/how I'm paying for it." In an instant message exchange on or about January 31, 2014, during a discussion of how to convey GCF funds to DAVID M. GLUTH for personal use, J.H. stated, "if I give you 2500 out of GCF it will look like your salary."

11. It was further part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. obtained (and attempted to obtain) loans and credit in the name of GCF, and disposed of GCF assets, without W.F.'s knowledge or authorization. DAVID M.

GLUTH and J.H. made false and misleading statements and omissions in the course of these improper and fraudulent transactions. DAVID M. GLUTH and J.H. took these actions to conceal GCF's true financial condition from W.F. and others, and also to pay for unauthorized personal expenses. The unauthorized transactions included, but were not limited to: three loans from Main Street Business Loans ("MSBL"); a loan from Quarterspot; a loan from an individual, "L.M.;" and a sale of GCF receivables to BizFi Funding, a/k/a Quick Capital Funding, a/k/a Merchant Cash & Capital LLC ("BizFi").

12. It was further part of the scheme and artifice to defraud that, on or about July 18, 2013, DAVID M. GLUTH and J.H. submitted an application for a short-term, high-interest loan from MSBL. DAVID M. GLUTH signed the application and verified that he had legal authority to enter into the transaction on GCF's behalf. In truth and fact, as DAVID M. GLUTH and J.H. knew, DAVID M. GLUTH did not have authority to enter into the transaction, as W.F. had no knowledge of the transaction and had not authorized it. DAVID M. GLUTH and J.H. submitted a forged and altered Internal Revenue Service K-1 tax form as part of the application. The altered K-1 form showed that DAVID M. GLUTH was a 51% owner of GCF, when – as DAVID M. GLUTH and J.H. knew – DAVID M. GLUTH and W.F. each owned 50%. DAVID M. GLUTH and J.H. submitted the altered K-1 to mislead MSBL into believing that DAVID M. GLUTH had unilateral authority to enter into the transaction on GCF's behalf.

13. It was further part of the scheme and artifice to defraud that the initial MSBL loan was funded on or about July 25, 2013, in the amount of approximately $120,955. DAVID M. GLUTH and J.H. obtained subsequent loans from MSBL in 2014 and 2015 based upon additional fraudulent loan applications.

14. It was further part of the scheme and artifice to defraud that that DAVID M. GLUTH and J.H. concealed the existence of the MSBL loans from W.F. and others. In an instant message exchange on or about August 13, 2013, J.H. told DAVID M. GLUTH that she would put "it in income so [W.F.] will not see it, only the two of us will know it is there." In an instant message exchange on or about February 10, 2014 – during a

discussion about applying for a second MSBL loan – DAVID M. GLUTH told J.H., "I'm doing it without [W.F.'s] knowledge, if anything goes wrong it won't be good." In an instant message exchange on or about March 27, 2014, DAVID M. GLUTH told J.H., "I can't let [W.F.] know this loan exists."

15. It was further part of the scheme and artifice to defraud that, on or about July 17, 2015, DAVID M. GLUTH entered into a written agreement with L.M. that was titled "Personal Loan Agreement." The Personal Loan Agreement provided that L.M. would loan $150,000 to DAVID M. GLUTH, who was identified as the "Borrower." The Personal Loan Agreement provided that the Borrower – DAVID M. GLUTH – was responsible for repaying the loan on a set schedule. On or about February 1, 2016, DAVID M. GLUTH sent an e-mail to J.H. In the email, DAVID M. GLUTH asked J.H. to fraudulently alter the Personal Loan Agreement by identifying GCF, rather than DAVID M. GLUTH, as the Borrower. DAVID M. GLUTH stated: "Otherwise I could be stuck with this." An altered Personal Loan Agreement was prepared that identified GCF as the Borrower in the text (although DAVID M. GLUTH was still listed as the Borrower in the signature block). As DAVID M. GLUTH and J.H. knew, W.F. had no knowledge of, and did not authorize, either the initial Personal Loan Agreement or the alteration that purported to make GCF responsible for the debt.

16. It was further part of the scheme and artifice to defraud that, in or about December 2015, DAVID M. GLUTH and J.H. arranged for the sale of approximately $143,000 of GCF assets, in the form of receivables, to BizFi. BizFi paid GCF approximately $100,000 for the assets. In connection with this sale, DAVID M. GLUTH signed a Merchant Agreement with BizFi in which DAVID M. GLUTH falsely certified that he had authority to enter into the transaction. As DAVID M. GLUTH and J.H. knew, W.F. had no knowledge of this transaction and did not authorize it.

17. It was further part of the scheme and artifice to defraud that, in or about October of 2015, DAVID M. GLUTH and J.H. arranged for GCF to borrow money from Quarterspot. As DAVID M. GLUTH and J.H. knew, W.F. had no knowledge of this

transaction and did not authorize it. On or about October 28, 2015, DAVID M. GLUTH and J.H. submitted a false and fraudulent "Borrower Agreement" to Quarterspot, which included forged signatures for W.F. DAVID M. GLUTH and J.H. also submitted a forged driver's license in the name of W.F. The forged driver's license showed a photograph of "J.O.", a GCF employee.

18. It was further part of the scheme and artifice to defraud that, on or about October 28, 2015, DAVID M. GLUTH and J.H. discussed the fraudulent Quarterspot loan application and the forged driver's license over instant messaging. The exchange was triggered by J.O.'s objection to the use of the forged driver's license. J.O. messaged J.H. and asked her "to not use my ID for anything, and never ask me to do that again." J.H. responded, "ok – and ok, sorry." DAVID M. GLUTH then instructed J.H. to "tell [J.O.] you canceled the deal." J.H. responded "ok." DAVID M. GLUTH then told J.H., "you don't need to cancel the deal," and "it would be nice not to have [W.F.] involved." DAVID M. GLUTH later told J.H., "I told him [W.F.] it was canceled though, that's our story." On or about October 28, 2015, DAVID M. GLUTH and J.H. submitted fraudulent loan documents with W.F.'s forged signature.

19. It was further part of the scheme and artifice to defraud that DAVID M. GLUTH and J.H. made false and misleading statements and omissions in connection with a legal action instituted by W.F. in King County Superior Court. W.F. filed the action on or about December 21, 2015, alleged that DAVID M. GLUTH had improperly used GCF funds for personal purposes and had mismanaged GCF. The false and misleading statements by DAVID M. GLUTH and J.H. included, but were not limited to: a January 16, 2015, declaration by DAVID M. GLUTH in which he falsely stated that he did not authorize the submission of falsified documents to QuarterSpot; a May 19, 2016, declaration by J.H. in which she falsely stated that she had not concealed transactions in GCF's records; and a March 23, 2016, deposition given by J.H. in which she denied knowledge of the forgery and fraud associated with the Quarterspot loan.

C. **Execution Of The Scheme To Defraud**

20. On or about July 11, 2015, at Everett, within the Western District of Washington, and elsewhere, having devised the above-described scheme and artifice, DAVID M. GLUTH and J.H., for the purpose of executing this scheme and artifice, did knowingly cause to be transmitted by wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: an electronic transmission from a Safeway store in Everett, Washington, to American Express in Phoenix, Arizona, resulting from a $90.68 credit card purchase.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## ASSET FORFEITURE ALLEGATION

The allegations contained in Count 1 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. Upon conviction for the offense alleged in Count 1, the Defendant DAVID M. GLUTH shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), all property constituting or traceable to proceeds of the offense, including but not limited to a sum of money reflecting the proceeds he obtained from the offense.

**Substitute Assets.** If any of the above-described forfeitable property, as a result of any act or omission of the Defendant,

1. cannot be located upon the exercise of due diligence;
2. has been transferred or sold to, or deposited with a third party;
3. has been placed beyond the jurisdiction of the Court;
4. has been substantially diminished in value; or,
5. has been commingled with other property which cannot be divided without difficulty;

1  it is the intent of the United States to seek the forfeiture of any other property of the
2  Defendant up to the value of the above-described forfeitable property pursuant to Title
3  21, United States Code, Section 853(p).

5  DATED this 17TH day of November, 2020.

BRIAN T. MORAN
United States Attorney

ANDREW FRIEDMAN
Assistant United States Attorney

MICHAEL DION
Assistant United States Attorney